UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

TEVIN JAMARIOND NERO,

        Petitioner,                  Case No. 1:16-cv-1059

v.                                          Honorable Janet T. Neff

THOMAS WINN,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of 15 to 30 years, imposed by the Kent County Circuit Court on November 7, 2013, after a jury convicted Petitioner of armed robbery, MICH. COMP. LAWS § 750.529, as a third-offense habitual offender, MICH. COMP. LAWS § 769.11. In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

    I.      There was Insufficient Evidence to convict of Armed Robbery.

    II.     The [Petitioner] was Denied a fair trial because the trial court failed to Declare A mistrial after a Juror Revealed Extraneous Influences.

(Pet., ECF No. 1, PageID.6-7.) Respondent has filed an answer to the petition (ECF No. 9) stating that the grounds should be denied because they lack merit. Upon review and applying the AEDPA standards, I find that both of Petitioner's habeas grounds are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from an armed robbery committed by three men, including Petitioner. Petitioner was charged with one count of armed robbery. He waived his preliminary examination, and a supplemental information was filed charging Petitioner as a habitual offender, third offense. Petitioner was tried before a jury beginning on September 23, 2013, and concluding on September 25, 2013.[1]

The Michigan Court of Appeals described the facts as follows:

> On December 10, 2012, defendant [Tevin Nero], Robert Calloway, and Terrance Ashford robbed Christopher Tymczyn. Specifically, according to Tymczyn's testimony, at about 10:00 p.m., three men began to follow him when he got off a bus, so he stepped off the sidewalk, onto the grass, to allow them to pass. Instead one of the men, later identified as defendant, asked Tymczyn: "Are you scared?" and "Do you want to scrap?" While they were talking, Tymczyn noticed that one of the men had a gun, though according to testimony from Ashford and Calloway it was actually a BB gun. Tymczyn told the men he did not want to "scrap" and he continued walking. One of the men continued to harass Tymczyn by asking for his telephone. Tymczyn then started to run, and the three men ran after him. When Tymczyn slowed down, Calloway came up to Tymczyn, punched him in the head, and took Tymczyn's headphones. Ashford also came from behind and "pistol whipped" Tymczyn with a BB gun. Defendant, Ashford, and Calloway then ran away. Tymczyn called 911. Defendant and Ashford were soon stopped by the police. Tymczyn identified defendant and Ashford as two of the men involved in the attack.

(3/12/15 Mich. Ct. App. Op. (MCOA Op.), ECF No. 10-8, PageID.201.)

At the conclusion of trial, on September 25, 2013, the jury found Petitioner guilty of armed robbery. (T. Tr. III, PageID.192-193.) On November 7, 2013, Petitioner was sentenced to

---

[1]Trial transcripts hereafter will be referenced as follows:
Transcript of September 23, 2013:            (T. Tr. I, ECF No. 10-2, PageID.___.)
Transcript of September 24, 2013:            (T. Tr. II, ECF No. 10-3, PageID.___.)
Transcript of September 25, 2013:            (T. Tr. III, ECF No. 10-4, PageID.___.)

serve a term of 15 to 30 years as a third-offense habitual offender. (Sentencing Transcript, (S. Tr.), ECF No. 10-5, PageID.195-195.)

### B.     Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on June 18, 2014, raised the same two issues as raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, ECF No. 10-8, PageID.218.) By unpublished opinion issued on March 12, 2015, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* MCOA Op., ECF No. 10-8, PageID.201-204.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court, raising the same two claims presented to and rejected by the Michigan Court of Appeals. Petitioner was granted leave to amend his application, in which he further developed his first issue. By order entered September 9, 2015, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., ECF No. 10-9, PageID.263.)

### C.     Post-conviction relief

Petitioner filed a motion for relief from judgment, raising the same two grounds presented and rejected on direct appeal. In an order issued on December 22, 2015, the trial court denied the motion under MICH. CT. R. 6.508(D)(2), because the grounds had been decided against him on direct review and no retroactive change in the law undermined the prior decision. (12/22/15 Cir. Ct. Ord, ECF No. 10-7, PageID.199-200.) Petitioner did not appeal the trial court's decision.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo*

review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### A. Ground I: Sufficiency of the Evidence

In his first ground for habeas relief, Petitioner argues that the prosecutor presented insufficient evidence against Petitioner to convict him of armed robbery. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's

responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals addressed the issue as follows:

> On appeal, defendant argues insufficient evidence was presented at trial to convict him of armed robbery. In particular, defendant does not dispute whether an armed robbery was committed, nor does he deny that he was with Ashford and Calloway at the time of the robbery. Instead, defendant's contention on appeal is that he did not assist or encourage the commission of the crime. He maintains he was merely present for the robbery and that, even under an aiding and abetting theory, his mere presence cannot support an armed robbery conviction.

We review a challenge to the sufficiency of the evidence in a criminal case de novo. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). The test for determining the sufficiency of the evidence is "whether the evidence, viewed in a light most favorable to the [prosecution], would warrant a reasonable juror in finding guilt beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 399; 614 NW2d 78 (2000). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). Further, this Court defers to the trier of fact's determinations regarding the weight of the evidence or the credibility of witnesses, and we resolve any conflicts in the evidence in favor of the prosecution. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

"The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon." *People v Smith*, 478 Mich 292, 319; 733 NW2d 351 (2007). A person may be held liable for armed robbery under an aiding and abetting theory. *See* MCL 767.39. Specifically, "[o]ne who procures, counsels, aids, or abets in the commission of an offense may be convicted and punished as if he committed the offense directly." *People v Norris*, 236 Mich App 411, 419; 600 NW2d 658 (1999), citing MCL 767.39.

> The elements of aiding and abetting are (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. *[People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010) (citation omitted) (alteration in original)].

Aiding and abetting encompasses "any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004). In contrast, "[m]ere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime." *Norris*, 236 Mich App at 419-420. An aider and abettor's state of mind may be inferred from all the facts and circumstances. *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999). "Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Id.* (citation omitted).

In this case, although defendant did not personally take Tymczyn's property or conduct the assault, there is nonetheless sufficient evidence to support the

conclusion that he was not merely present but rather an active participant in events, and he is thus guilty of aiding and abetting the armed robbery. That is, before the robbery, defendant was well aware of Ashford's intent because Ashford suggested to defendant and Calloway that they "do something stupid" and rob someone. Knowing Ashford's intent, defendant participated in following Tymczyn and he confronted Tymczyn, asking him whether he was "scared" and if he wanted to "scrap." Indeed, following Ashford's suggestion to rob someone, it was defendant who first made contact with Tymczyn. Having initiated contact, defendant remained while Ashford and Calloway assaulted Tymczyn, and defendant then fled with them while they were in possession of Tymczyn's property. Further, while in their testimony Ashford and Calloway tried to downplay defendant's involvement in the crime, Ashford testified at trial that when he pleaded guilty to unarmed robbery in connection with these events, he told the presiding judge that defendant helped him in the robbery. Viewing the evidence in a light most favorable to the prosecution, and drawing all reasonable inferences in support of the verdict, a reasonable juror would be warranted in finding beyond a reasonable doubt that defendant performed acts or gave encouragement that assisted in the commission of the crime and that, at the time of assistance, he intended the commission of the crime or had knowledge the principal intended its commission. *See Nowack*, 462 Mich at 399-400. Defendant's conviction is supported by sufficient evidence.

(MCOA Op., ECF No. 10-8, PageID.201-203.)

Although the court of appeals did not cite federal cases, it is apparent that the court applied the applicable federal constitutional standard in denying Petitioner's claim. Not only does the recited standard parallel the *Jackson* standard, but also *People v. Nowak*, 614 N.W.2d 78, 81 (Mich. 2000), the case cited by the Michigan Court of Appeals, itself cites *Jackson*, 443 U.S. 307.

Petitioner does not dispute any fact relied upon by the court of appeals. Instead, Petitioner argues only that the jury should have disbelieved the victim, Tymczyn, when he testified that Petitioner was one of the three robbers and was the person who first approached him and asked him if he wanted to "scrap." (T. Tr. II, ECF 10-3, PageID.139, 141.) Petitioner argues that the jury should have believed Calloway, when he indicated that Petitioner was following at some distance and was not a part of the crime, and both Ashford and Calloway when they testified that Petitioner was merely present at the time the robbery was committed. The jury, however, had the

"responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The jury elected to believe the victim, rather than Petitioner's accomplices who attempted to minimize Petitioner's involvement. Moreover, Calloway, gave conflicting testimony that was repeatedly impeached with his own earlier statements, his testimony at his own plea hearing, and the recorded phone call with Petitioner while Petitioner was in the jail. (T. Tr. II, ECF 10-3, PageID.148-153, 157-158.) The jury's decision not to believe him, therefore, was entirely reasonable. In addition, Ashford disagreed with Calloway with respect to Petitioner's distance from the robbery. (T. Tr. III, ECF No. 10-4, PageID.163.) Ashford also testified that Petitioner told him after the robbery, "[W]e just robbed that dude." (*Id.*, PageID.164.) Further, Ashford acknowledged that, at his plea hearing, he incriminated Petitioner, rather than Calloway, as person who helped him rob Tymczyn. (*Id.*, PageID.165.) Under these circumstances, the jury acted reasonably in believing that Petitioner had participated in the robbery.

I have reviewed the facts cited by the court of appeals and find them to be fully supported by the trial testimony. Those facts are sufficient to support each element of the offense of armed robbery. The court of appeals' decision therefore constituted both an entirely reasonable determination of the facts and an entirely reasonable application of the *Jackson* standard.

### B.   Ground II:  Denial of Mistrial

In his second ground for habeas relief, Petitioner argues that the trial court denied him due process when it refused to grant a mistrial based on contact between jurors and certain men outside the courtroom after jury selection the day before. On the second day of trial, before any testimony had been taken in the case, the court conducted an in-chambers hearing to consider the

consequences of a juror's call to the court to report contact between members of Petitioner's family and certain jurors. The court reported that the juror had indicated that the contact led her to feel intimidated and threatened. (T. Tr. II, ECF No. 10-3, PageID.129.) The court then interrogated the juror, in the presence of the prosecutor, defense counsel, and Petitioner:

> THE COURT: . . . My judicial clerk informed me yesterday you may have called and related an experience that happened after we excused you and your fellow jurors. Will you tell us what happened, please?
>
> JUROR IN SEAT # 14: We were all out there, but there was a person that was in the courtroom when you were doing the jury selection, and then we recognized him and three other men outside.
>
> THE COURT: This was out on the first floor?
>
> JUROR IN SEAT # 14: No, the tenth floor elevators, and they didn't say anything really like they were going to do anything to us, but the way that they were talking about – there was only one black person on the jury, and they were just kind of being intimidating and belligerent and flapping their arms around, and they kind of . . . [t]hey just kind of intimidated us, and the other, you know, juror, she said that's what they were trying to do. And I only called because I was scared that, you know, they would be able to find out who we were and whatever. I don't know – just the way they were acting. They didn't say they were going to do anything. But it kind of freaked me out, and I'm not the only one. The other jurors even talked about it this morning.
>
> THE COURT: Were all the other jurors with you?
>
> JUROR IN SEAT # 14: Oh, yes. We were all together. It was as soon as we came out. Maybe I'm the only one that called just because I wanted to be assured that we would be okay.
>
> THE COURT: First of all, let me tell you this, regardless of the outcome today or in the future, no one's name has been mentioned. We only refer to you by your juror number, and we don't release the information of names or addresses. So I can give you that assurance, and your safety of course is paramount as everyone's is, defendant's, lawyers, public, and the deputies are certainly capable of maintaining your safety. I'm going to ask the lawyers if they have any questions of you just about this, and then I'll have maybe a few more. Mr. Hillary?
>
> BY MR. HILLARY:

Q. This was on the tenth floor as all of the jurors were waiting for the elevator?

A. Yes, as soon as we came out of the back hallway here, as soon as the door got opened up by the clerk.

Q. Was it all men?

A. All men.

Q. Do you recall anything that they said?

A. Oh, something about, "What is this?" You know, it was more their action, I guess. "What is this, the eighteen hundreds? There's only one black person on the jury." The way they were doing their motions and stomping around – I don't know really. No. It just frightened me. We got on the elevator and left.

Q. When you say we got on the elevator –

A. All the jurors except for two didn't fit on.

Q. Did you discuss this with the other jurors afterwards?

A. The juror in the elevator, the one girl that was the only black one on there, she rolled her eyes. I feel like she might have been a little embarrassed. She said, "Oh, they're just trying to intimidate us. Don't worry about it."

Q. She said that to everybody? . . . That was on the elevator, "They're trying to intimidate us?"

A. She was trying to reassure us, oh, they are just trying to intimidate us.

Q. Did any other jurors indicate they were in fact intimidated?

A. No.

Q. You feel intimidated.

A. I didn't talk to them about me calling.

Q. Did you talk to them about the action of the people that were waving their arms and talking outside the elevator? Who did you talk to about that?

A. Well, just the judge's clerk when I called. When we got down to the jury room yesterday, that same lady mentioned it to the jury clerk that we had been approached or whatever at the elevators, and the jury clerk said she was going to say something to your clerks, because there shouldn't be anybody waiting there at the elevators for us. So she was going to mention that to – I can't remember your clerk's names, but . . . . She said she was going to say something to them. Then that was fine, and I went home. And I was still just thinking about it. And wanted to call to make sure that –

Q. I guess my question is, other than the black juror that indicated they're just trying to intimidate you, did you discuss this action that the others were making with other jurors?

A. No. I mean, we didn't discuss it. It did come up this morning. . . . I'm trying to remember. I think that because we got off on a different floor and took a back elevator, one of the jurors said they thought maybe they did that because of what happened yesterday. And that's pretty much it in reference to the people that were waiting for us outside the elevator. He said, "Maybe why we're coming up the back way is because of what happened yesterday."

(T. Tr. II, ECF No. 10-3, PageID.129-130.) The prosecutor clarified with the juror that Petitioner was not one of the men involved. The court then summarized its impressions, and defense counsel clarified his objections to continuing the trial with the same jury:

> THE COURT: I thank you very much for calling. I hope you understand that it's important that we understand what happened. Based on this experience, is there any hesitancy in your mind about your ability to continue to serve as a juror?
>
> JUROR IN SEAT #14: No, there isn't. I just wanted to be reassured, you know.
>
> THE COURT: All right. Well, what I'm going to ask you to do is just have a seat right out here in the lobby, and we'll be right back to you. . . . [Juror excused]
>
> THE COURT: The record can only reflect the words that this juror was moved to tears, but she's composed now. And her reaction to my last question was spontaneous and unambiguous, so I don't know that there is any evident bias on her part by virtue of this. Mr. Hillary?
>
> MR. HILLARY: Judge, I think she's still emotionally upset. I don't think she's quite with it, and I think she's tainted the entire jury panel. I really do. I think that they've had conversations about Mr. Nero's family trying to intimidate the jury.

- 13 -

> And even the black juror said to all of them on the elevator, "Oh, don't worry, they're just trying to intimidate you" to the point where she gets moved to tears and obviously discussed it with others – well, this is the reason we're coming up on the elevator to be protected from Mr. Nero's family.
>
> And I just have a hard time believing with all of that going on that, that somehow won't prejudice them or make them a little more bias[ed] against Mr. Nero than they were prior to her concerns about being intimidated.
>
> I kind of envision it as whoever these people were – simply talking among themselves, and some of the jurors overhearing it. So I guess my feeling is the entire jury may be tainted, but that's on the record.
>
> . . .
>
> The only thing I would add, your Honor, just for the record, I think my objection going forward with this jury panel is noted, that had she simply not had any conversation with other jurors and there wasn't any followup on it and it was simply her calling the court in the morning or at home saying that she was concerned – I think what bothers me is another juror making a comment about being intimidated and also a third juror coming up on the elevator saying, well, because of the intimidation of what happened yesterday, they're sending us up on the elevator.

(*Id.*, PageID.130-131.)

Ultimately, the court concluded that the juror's testimony had not demonstrated that the jury was biased. Defense counsel then drafted an inquiry for the jury that would not highlight the interaction, and the court asked the following question before delivering preliminary instructions to the jury:

> THE COURT: . . . Since being selected as a jury yesterday, do any of you have any additional concerns that would affect your being a fair and impartial juror, anyone? I see no hands raised. Very well.

(*Id.*, PageID.132.) Petitioner contends that the court should have granted his motion for mistrial.

The court of appeals addressed the issue at length:

> Next, defendant claims he was denied a fair trial because the trial court failed to declare a mistrial after a juror revealed an extraneous influence. In particular, defendant maintains that the trial court should have declared a mistrial after a juror

- 14 -

revealed that [] she had been "frightened" when she and the other jurors were approached near the elevator by three men who commented in the jurors' hearing on the racial composition of the jury. Alternatively, defendant asserts that, at a minimum, the juror in question should have been excused or the other jurors questioned.

At trial, although defendant did not specifically move for a mistrial, he objected to "going with this jury panel." Assuming this objection can be seen as a request for a mistrial, we review a trial court's decision to grant or deny a mistrial for an abuse of discretion. *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003). Likewise, we review for an abuse of discretion a trial court's decision regarding whether to remove jurors. *People v Unger*, 278 Mich App 210, 259; 749 NW2d 272 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id.*

"A mistrial is warranted only when an error or irregularity in the proceedings prejudices the defendant and impairs his ability to get a fair trial." *People v Waclawski*, 286 Mich App 634, 708; 780 NW2d 321 (2009) (citation omitted). A defendant's right to a fair trial includes a right to a jury that is "fair and impartial." *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment." *Id.* Consequently, "[t]he trial court must take appropriate steps to ensure that jurors will not be exposed to information or influences that could affect their ability to render an impartial verdict based on the evidence admitted in court." *People v Jackson*, 292 Mich App 583, 592; 808 NW2d 541 (2011).

However, a new trial is not required every time a juror has been placed in a compromising situation. *Id.* at 592-593. Rather, a defendant requesting reversal based on extraneous influences on the jury must establish two points. "First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict." *Budzyn*, 456 Mich at 88-89 (internal citations omitted). "Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict." *Id.* at 89.

In this case, the record shows that, after the first day of trial, while the jury was waiting for the elevator, a group of three African-American men approached them. One of the men asked, "What is this, the eighteen hundreds? There's only one black person on the jury." Juror #14 felt intimidated by this statement and brought it to the court's attention. The juror was questioned by the prosecution and defendant. The juror became emotional when recounting the incident, but she told

the trial court that she could continue to be a juror in this case and she indicated that none of the other jurors appeared to have been intimidated by the incident. After speaking with Juror #14, the trial court asked all the jurors whether they had any additional concerns that would affect them from being fair and impartial and none of the jurors raised their hands or otherwise expressed any concerns.

On these facts, the trial court did not abuse its discretion by failing to grant a mistrial, or to take other action, based on Juror #14's disclosure to the court. Specifically, the jury was exposed to an extraneous influence insofar as the encounter occurred outside the trial court proceedings, but the statement was not related to a material aspect of the case and, viewed objectively, this isolated incident did not create a real and substantial possibility of affecting the jury's verdict. See *Budzyn*, 456 Mich at 89 & n 10. The men who approached the jury made no comment on the evidence or facts relating to defendant's guilt, and there was no indication that the armed robbery was motivated by race or that race otherwise played a role during trial. Most importantly, the questioning of Juror #14 and the jury did not reveal any information or circumstances to suggest that the jury's ability to render a fair and impartial verdict had been compromised. Although Juror #14 appeared to be emotional when she recounted the statement to the trial court, she was composed at the end of the questioning and indicated to the trial court that she could continue as a juror. She told the trial court that no other juror appeared intimidated by the statement after it was made, and no juror raised a hand in response to the trial court's question. Under these circumstances, the trial court did not abuse its discretion when it failed to declare a mistrial.

(MCOA Op., ECF No. 10-8, PageID. 203-204.)

Although the court of appeals did not recite the federal constitutional standard, the considerations on which it relied parallel the constitutional inquiry. "The Sixth Amendment's right to trial by jury 'is designed to ensure criminal defendants a fair trial by a panel of impartial, indifferent jurors.'" *United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002) (quoting *United States v. Davis*, 177 F.3d 552, 556-57 (6th Cir. 1999) (internal quotation marks and citations omitted)). "In a criminal case, any private communication, contact or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties."

*Remmer v. United States*, 347 U.S. 227, 229 (1954). The presumption, however, is not conclusive. *Id.* "When a juror is exposed to unauthorized communications involving a case, the district court must 'determine the circumstances [of the communications], the impact [of the communications] upon the juror, and whether or not [the communications were] prejudicial.'" *United States v. Taylor*, 814 F.3d 340, 348 (6th Cir. 2016) (quoting *Remmer v. United States*, 347 U.S. at 229-30). However, in recognition of two important purposes, the district court retains considerable discretion in deciding how to conduct the inquiry. *Taylor*, 814 F.3d at 348. First, the trial court is particularly qualified to ascertain the influence and impact of the communication. Second, flexibility permits the trial court to make the inquiry without "'unnecessarily highlight[ing] the [communication] in the eyes of the jurors.'" *Id.* (quoting *United States v. Mack*, 729 F.3d 594, 606 (6th Cir. 2013)).

As contemplated by *Remmer*, the trial court in this case properly inquired about the nature of the communication, the impact of the communication on the interviewed juror and the jury as a whole, and whether jurors' abilities to be fair and impartial had been affected in any way. As discussed, the trial court held a hearing immediately after being informed of the troubling encounter. The court and defense counsel questioned the individual juror thoroughly about the circumstances of the contact. The court asked the juror about her ability to continue to fairly serve as a juror and received an immediate and unqualified assurance that she could do so. In addition, the jury as a whole was asked if, since being selected, they had any concerns that would affect any juror's ability to be fair and impartial. No juror expressed any concern. The court therefore found that the communication had not affected any juror's capacity to be fair and impartial. That factual finding is entitled to a presumption of correctness, which may be overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Michigan Court of Appeals agreed, concluding that the trial court had not abused its discretion in denying a mistrial. In reaching its decision, the court of appeals relied both on the jurors' indications that they had not been influenced and had not affected the decision, with which it agreed, and on the fact that the comments were not related to a material aspect of the case. As with the trial court, the court of appeals' factual findings are entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), and those findings are supported by the record evidence. Moreover, upon review of all the circumstances, I conclude that the court of appeals' application of those facts to the legal standard was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. I therefore recommend that Petitioner's second ground for habeas relief be denied.

## Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard

by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong. Therefore, I recommend that a certificate of appealability should be denied.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Date: May 30, 2017  /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).